****CORRECTED COPY – DESTROY ALL OTHERS****

# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

### UNITED STATES

**v.**

### Senior Airman JAMES R. LEWIS
### United States Air Force

### ACM 38321

### 09 October 2014

Sentence adjudged 13 December 2012 by GCM convened at Barksdale Air Force Base, Louisiana. Military Judge: Donald R. Eller (arraignment) and J. Wesley Moore (trial).

Approved Sentence: Dishonorable discharge, confinement for 9 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for the Appellant: Captain Thomas A. Smith.

Appellate Counsel for the United States: Captain Richard A. Schrider and Gerald R. Bruce, Esquire.

Before

SANTORO, WEBER, and CONTOVEROS
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final release.

SANTORO, Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of aggravated sexual assault for penetrating Senior Airman (SrA) KF's vagina with his penis; wrongful sexual contact for touching the breasts and vagina of Airman First Class (A1C) TY; and wrongful sexual contact for touching the breasts and vagina of A1C CB, in violation of Article 120, UCMJ, 10 U.S.C. § 920.[1] The

---

[1] The appellant was acquitted of two other specifications alleged under Article 120, UCMJ, 10 U.S.C. § 920.

adjudged and approved sentence was a dishonorable discharge, confinement for 9 years, forfeiture of all pay and allowances, and reduction to E-1.

Before us, the appellant asserts that (1) the evidence was factually insufficient to support his conviction for the aggravated sexual assault of SrA KF; (2) the evidence was factually insufficient to support his conviction for the wrongful sexual contact of A1C TY; (3) his trial defense counsel was ineffective when she conceded his guilt during her presentencing argument; (4) his sentence is inappropriately severe; (5) the military judge erred by failing to instruct on the definition of "sexual act" and the effect of voluntary intoxication; (6) the specification involving A1C TY was referred improperly; and (7) the sentence failed to take into account the maximum sentence for each individual specification.[2] We disagree and affirm.

*Background*

SrA KF became friends with the appellant after she arrived at Barksdale Air Force Base. They spent time together several times a week for approximately one month. SrA KF allowed the appellant to visit her regularly and occasionally spend the night in her dormitory room. Their discussions included personal matters, including the nature of the appellant's relationship with his wife and child; they never discussed intimacy. SrA KF testified that she felt no romantic interest toward the appellant and that there was "something about him that bothered" her. Despite her lack of interest in him, the appellant told SrA KF that he thought they were dating.

In late-November or early-December 2010, the appellant appeared at SrA KF's dormitory room wearing his "hoodie" up. SrA KF interpreted that as a sign that the appellant was concerned about something, as he had previously worn his "hoodie" up when depressed. The appellant told SrA KF that he had received a text message from his wife threatening suicide and saying that he was a terrible husband. Although she was sick and had just taken Nyquil and Sudafed, SrA KF invited the appellant into her room to talk. He smelled as though he had been drinking. SrA KF testified that she called the Unit Training Manager and agreed to watch the appellant that night and keep his mind off things until the unit could make contact with his wife.

After talking for a while, the appellant fell asleep on the floor. SrA KF went to the kitchen to make a pot of coffee because she was feeling very tired. She fell asleep at the kitchen table waiting for the coffee to brew. The next thing she remembered was awakening in her bed in extreme pain with the appellant on top of her, penetrating her vagina with his penis.[3] She put her hand against his chest and "kind-of pushed." The appellant, grunting, ejaculated on her shirt a minute or two later.

---

[2] Issues 6 and 7 are raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).
[3] Senior Airman KF testified that she was a virgin at the time of this incident.

SrA KF went into the bathroom to take a shower. The appellant, uninvited, got into the shower with her. She immediately left the shower and got dressed. When the appellant got out of the shower, he lay down in her bed and fell asleep. At that time, she went out into the kitchen and sat down.

Some time later, the squadron's first sergeant called SrA KF. They decided that SrA KF would watch the appellant while the unit continued to try to locate his wife. SrA KF testified that she and the appellant went shopping because she did not want to be alone in her room with him. The appellant's wife was located shortly thereafter.

SrA KF further testified that she did not report the incident until June 2012 because it was "easier for [her] not to say anything" and to pretend it had not happened.

Relating to the second incident, on 15 July 2011, A1C TY met the appellant for the first time when both attended a dinner party at a fellow Airman's home. After dinner, the guests moved to the living room to watch a movie. The appellant and A1C TY sat next to each other on the couch, covered by a blanket. The appellant attempted to hold her hand during the movie, but she did not allow him to do so. A1C TY, who was under age, did not drink; the appellant drank an unspecified quantity of Everclear and Hawaiian Punch. A1C TY thought the appellant was "cute" but was not romantically interested in him because she was in a relationship.

As the party wound down, the appellant offered to help A1C TY, who was recovering from a torn meniscus, carry her laundry from her car to her room. The appellant himself had also recently suffered a torn rotator cuff and was wearing a sling. The appellant asked if he could stay and watch a movie, and A1C TY agreed he could. A1C TY lay on her bed, and the appellant sat on the couch. She fell asleep watching the movie.

When she awoke, the appellant was on the bed touching her breast over her clothing. She pretended to be asleep and pulled away from him. The appellant put his hand under her shirt and then began rubbing her vaginal area over her clothes. A1C TY closed her legs and turned onto her stomach. She testified that the appellant then pushed her shorts and underwear aside and digitally penetrated her. She then testified that he penetrated her vagina with his penis. The appellant then got up, went into her bathroom, returned to her bed to "tuck her in," and left her room.

A1C TY lay in bed for a few minutes, then showered and "cried for a little while." She called a friend, told the friend what had occurred, and then the following day reported the incident to her supervisor and to a Sexual Assault Response Coordinator.

Relating to a third incident, on 16 June 2012, the appellant's unit held a "combat dining-in." The appellant attended, as did A1C CB and A1C JT, who were roommates. A1C CB's then-fiancé did not attend but was her designated driver. When he arrived to drive them home at the end of the event, he agreed to give the appellant a ride as well.

At A1C CB and A1C JT's apartment, the appellant and A1C JT engaged in consensual sexual intercourse. After having intercourse with A1C JT, the appellant left her room, ostensibly to walk around. After some time, A1C JT went looking for the appellant and found him in A1C CB's room, leaning over A1C CB while she was asleep on her bed. A1C JT yelled at the appellant. He seemed startled and fell to the floor, then he got up and left the room. A1C CB was awakened by the commotion and she and A1C JT laughed about the appellant's reaction and falling to the floor.

The appellant was in A1C JT's bed when A1C JT returned to her room. He again began to touch her sexually, but A1C JT told him she was not interested in any further sexual contact. She rolled over and fell asleep; she remembered hearing a door close but did not think much of it.

A1C CB then woke up to the appellant touching her breasts and vaginal area. She initially thought her fiancé had returned and was in the bed with her. She quickly realized it was not her fiancé but the appellant. She got out of bed, wrapped herself in a towel, turned the lights on, and told the appellant to leave. Crying, she woke A1C JT and asked her to make the appellant leave the apartment. A1C CB texted and called her fiancé to tell him what happened. When he returned to the apartment, A1C CB was initially too emotionally distraught to be understood. Shortly thereafter they called the police and reported the incident.

Additional facts necessary to resolve the assignments of error are included below.

*Factual sufficiency*

The appellant argues that the evidence is factually insufficient to establish his guilt beyond a reasonable doubt. We review claims of factual insufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the accused's guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent

determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[4] *Washington*, 57 M.J. at 399.

*Aggravated sexual assault of SrA KF*

Under the law applicable at the time of the appellant's offense, the elements of the charged offense of aggravated sexual assault were: (1) that at or near the time and place alleged, the appellant engaged in a sexual act with SrA KF, to wit: penetrating her vagina with his penis; and (2) that the appellant did so when SrA KF was substantially incapable of communicating unwillingness to engage in the sexual act. *See Manual for Courts-Martial, United States*, (*MCM*), App. 28 at A28-6 (2012 ed.).

The appellant challenges the factual sufficiency of the evidence, arguing that SrA KF was not credible and had a motive to fabricate the allegation. In support of his argument that SrA KF was not credible, he points to evidence that he was the person to whom she sent the most text messages, 2,900 messages during their friendship, she allowed him to spend the night in her room prior to the allegation of the assault, and that she did not verbally or more strenuously physically resist his advances. He also identifies perceived inconsistencies and implausibilities in SrA KF's account of events. Finally, he asserts that SrA KF falsified the allegation against him in an attempt to win back her boyfriend when she thought he was going to break off their relationship.

We have thoroughly reviewed the evidence, including the appellant's arguments at trial and on appeal about the weight of the evidence and the credibility of the witnesses. We have paid particular attention to each of the issues raised by the appellant. After weighing the evidence and making allowances for not having personally observed the witnesses, we are nonetheless convinced of the appellant's guilt of this offense beyond a reasonable doubt. We therefore reject this assignment of error.

*Wrongful sexual contact of A1C TY*

Under the law applicable at the time of the appellant's offense, the elements of the charged offense of wrongful sexual contact were: (1) that at or near the time and place alleged, the appellant engaged in sexual contact with A1C TY, to wit: touching her breasts and vagina; (2) that the sexual contact was without A1C TY's permission; and (3) that the sexual contact was wrongful. *See MCM*, App. 28 at A28-8.

As he did in his attack upon the sufficiency of the evidence relating to SrA KF, the appellant argues that A1C TY was not credible and had a motive to fabricate the allegation. The appellant argues that A1C TY was upset at her fiancé, who did not attend

---

[4] We granted the appellant's request to attach a response, pursuant to *Grostefon*, to the government's reply brief. We have considered the appellant's arguments but did not consider newly-raised factual assertions contained therein.

the party because he was in Dallas, Texas, and decided to flirt with the appellant. He additionally argues that A1C TY's decision to change into shorts and a baggy t-shirt, in preparation for bed, signaled her interest in him. Finally, he identifies what he argues are inconsistencies and implausibilities in A1C TY's description of events. He further argues that she is untrustworthy because she made a prior false sexual assault allegation.

We have again thoroughly reviewed the evidence contained in the record of trial, paying particular attention to those matters appellant has called to our attention. After weighing the evidence and making allowances for not having personally observed the witnesses, we are nonetheless convinced of the appellant's guilt of this offense beyond a reasonable doubt. We therefore reject this assignment of error.

*Ineffective Assistance of Counsel*

The appellant alleges that his trial defense counsel was ineffective because she conceded his guilt at sentencing by arguing:

> Let's talk about the events. *We know Airman Lewis crossed the line*. We know that. But what else is important about the offense? What else did you learn about Airman Lewis? He wasn't a forceful person. You heard that. He wasn't aggressive. He wasn't violent. You saw that he tried to make sexual contact and engage in sexual activities but when he was told to stop, he stopped.
>
> *He never should have done it in the first place. That is obvious, members. He never should have done it.* But when he was told to stop, he did. Airman Lewis is here today because he didn't appreciate the importance of those boundaries. *It is no doubt that Airman Lewis made bad decisions. . . .*

(emphasis added).

In contrast to trial counsel's argument for a dishonorable discharge and at least 10 years' confinement, trial defense counsel argued for no punitive discharge and confinement measured in months, not years.

This court reviews claims of ineffective assistance of counsel de novo. *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009). When reviewing such claims, we follow the two-part test outlined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007). Our superior court has applied this standard to military courts-martial,

noting that "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687; *Mazza*, 67 M.J. at 474).

The deficiency prong requires the appellant to show his counsel's performance fell below an objective standard of reasonableness, according to the prevailing standards of the profession. *Strickland*, 466 U.S. at 688. The prejudice prong requires the appellant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In doing so, the appellant "must surmount a very high hurdle." *United States v. Moulton*, 47 M.J. 227, 229 (C.A.A.F. 1997) (citing *Strickland*, 466 U.S. at 689). This is because counsel is presumed competent in the performance of his or her representational duties. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001). Thus, judicial scrutiny of a defense counsel's performance must be "highly deferential and should not be colored by the distorting effects of hindsight." *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000) (citing *Moulton*, 47 M.J. at 229).

To determine whether the presumption of competence has been overcome, our superior court has set forth a three-part test:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

"[T]he defense bears the burden of establishing the truth of the factual allegations that would provide the basis for finding deficient performance." *United States v. Tippit*, 65 M.J. 69, 76 (C.A.A.F. 2007) (citing *Polk*, 32 M.J. at 153). When there is a factual dispute, appellate courts determine whether further fact-finding is required under *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997). As the sentencing argument is contained in the record, there is no need for an additional hearing. *See id.*

> [I]n general, when an accused has consistently denied guilt, a functional defense counsel should not concede an accused's guilt during sentencing, not only because this can serve to anger the panel members, but also because defense counsel may be able to argue for reconsideration of the findings before announcement of the sentence.

*United States v. Wean*, 45 M.J. 461, 464 (C.A.A.F. 1997). At the time of the Wean trial, members were allowed to reconsider findings of guilty at any time before announcement of the sentence. *Wean*, 45 M.J. at 464 n.4. Currently, and at the time of this court-martial, Rule for Courts-Martial (R.C.M.) 924 allows members to reconsider findings before they are announced in open court, and only the military judge sitting alone can reconsider findings after they have been announced, but before announcement of a sentence. *See* Drafter's Analysis, *MCM*, App. 21 at A21-72. With this change, the rationale that led to the *Wean* decision is weakened, as is the appellant's argument.

We ordered trial defense counsel to provide an affidavit in response to the ineffective assistance of counsel claim. In her affidavit, trial defense counsel explained that she was concerned that the members would look upon the appellant as a predator. She also felt limited in her ability to argue the appellant's rehabilitative potential, as there was evidence that he had committed an additional sexual assault prior to the offenses for which he was tried, and there was no evidence of good duty performance, off-duty, or pre-military conduct. She also characterized one of the victim's sentencing testimony as "the most compelling" she had ever heard as a judge advocate. Against this backdrop, trial defense counsel said that her argument and its tone were intended to "look to the future" while not risking losing credibility by appearing indignant or dismissing the victims' pain.

The excerpt of the defense argument cited by the appellant was but a portion of the overall presentation, in which trial defense counsel cogently argued as a mitigating factor the appellant's isolation as a child which led to his use of alcohol and seeking of sexual relationships to "fit in" with his peers. She further argued that the court-martial process would serve as a "wakeup call" to identify the bad decisions the appellant had made and, now that he was aware of the results of his behavior, he could learn from them and be rehabilitated.

Based on the evidence and the members' findings, trial defense counsel's tactical considerations were reasonable. When viewed in the context of the entire argument, we do not find that her level of advocacy fell measurably below that expected of fallible attorneys and therefore reject this assignment of error.

*Sentence Appropriateness*

This court reviews sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we find] correct in law and fact and determine[], on the basis of the entire record, should be approved." Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (citations omitted). We consider whether the appellant's sentence was appropriate "judged by 'individualized consideration' of [the appellant] 'on the basis of the nature and seriousness of the offense and the character of the offender.'" *United States v. Snelling*, 14 M.J. 267, 268 (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180–81 (C.M.A. 1959)).

While we have a great deal of discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999); *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A. 1988). The maximum imposable sentence was a dishonorable discharge, 32 years' confinement, forfeiture of all pay and allowances and reduction to E-1. The approved sentence of a dishonorable discharge, 9 years' confinement, forfeiture of all pay and allowances, and reduction to E-1 was clearly within the discretion of the convening authority. The appellant sexually assaulted three Airmen, including engaging in sexual intercourse with one who was asleep and unable to defend herself. Each of the victims testified about the significant impact the offense had on her and to her relationships, including levels of trust and feelings of safety and security. Accordingly, we hold that the approved sentence is not inappropriately severe and reject this assignment of error.

*Findings Instructions*

Whether a panel was properly instructed is a question of law to be reviewed de novo. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014). However, where counsel fails to object to an instruction at trial, we review the military judge's instruction for plain error. *Id.*; *United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013); R.C.M. 920(f). Under a plain error analysis, the appellant must show that: "(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the [appellant]." *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011). If the appellant shows a constitutional error, the burden shifts to the Government to show the error was harmless beyond a reasonable doubt. *United States v. Brewer*, 61 M.J. 425, 432 (C.A.A.F. 2005).

The appellant argues that the military judge's instructions were erroneous in two ways: that he failed to provide a definition of "sexual act" in his instructions on the aggravated sexual assault offense and that he failed to instruct on the impact of voluntary intoxication with respect to all of the specifications.

Before the military judge instructed the members, the parties engaged in an extensive discussion about the proposed instructions. Trial defense counsel raised several objections but did not request the inclusion of a definition of "sexual act" or an instruction on voluntary intoxication. After the military judge provided counsel an opportunity to review his proposed instructions, he asked whether trial defense counsel had any additional objections or requests for additional instructions. Trial defense counsel replied, "No, Your Honor."

We conclude that the appellant has forfeited any objection regarding failure to instruct on the definition of sexual act and the effect of voluntary intoxication. *See* R.C.M. 920(f). Therefore, we test for plain error.

### 1. Definition of "Sexual Act"

As discussed supra, the specification relating to SrA KF alleged that the appellant engaged in a sexual act while the victim was substantially incapable of communicating her unwillingness to engage in the sexual act. The specific sexual act alleged was that the appellant "penetrated the vagina of [SrA KF] with his penis."

The appellant argues that the military judge should have instructed on the definition of "sexual act" as follows: "the penetration, however slight, of the genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person." *See MCM*, App. 28 at A28-3, ¶ 45.1(t)(1)(b).

However, the definition applicable to the appellant's offense was "contact between the penis and the vulva, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight." *See MCM*, App. 28 at A28-3, ¶ 45.1(t)(1)(A)

The military judge instructed the members that the prosecution had to prove beyond a reasonable doubt that the appellant "engaged in a sexual act with [SrA KF], to wit: penetrating the vagina of [SrA KF] with his penis" and that he did so while SrA KF was substantially incapable of communicating unwillingness to engage in the sexual act. *See MCM*, App. 28 at A28-6. While the military judge did define "substantially incapable," he did not define "sexual act."

Even assuming error, we discern no material prejudice to the appellant's rights caused by the lack of an instruction on this matter. The members found that the

prosecution had proven beyond a reasonable doubt that the appellant penetrated the victim's vagina with his penis. The vulva are the external genital organs of the female, including the labia majora, labia minora, clitoris, and vestibule of the vagina. *See United States v. Jahagirdar*, 466 F.3d 149, 152 (1st Cir. 2006); Henry Gray, *Gray's Anatomy of the Human Body*, Bartleby.com http://www.bartleby.com/107/270.html (last visited 2 October 2014). There is no way the appellant's penis could have penetrated the victim's vagina without also penetrating her vulva, which satisfies the above definition of "sexual act." We therefore reject this assignment of error.

## 2. Voluntary Intoxication

The appellant alleges the military judge erred by failing to give an instruction on the impact of voluntary intoxication on each of the sexual assault allegations. The Military Judge's Benchbook contains a standard instruction on the effect of voluntary intoxication which states, in pertinent part:

> In deciding whether the accused had . . . a specific intent at the time [of the offense], you should consider the evidence of voluntary intoxication.
>
> The law recognizes that a person's ordinary thought process may be materially affected when he is under the influence of intoxicants. Thus, evidence that the accused was intoxicated may, either alone, or together with other evidence in the case cause you to have a reasonable doubt that the accused had the specific intent to [engage in sexual assault].

*See* Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, ¶ 5-12 (1 January 2010).

"[E]vidence of any degree of voluntary intoxication may be introduced for the purpose of raising a reasonable doubt as to the existence of actual knowledge, specific intent, willfulness, or a premeditated design to kill, if actual knowledge, specific intent, [or] willfulness . . . is an element of the offense." R.C.M. 916(l)(2). However, "[w]hen raising an issue of voluntary intoxication as a defense to a specific-intent offense, 'there must be some evidence that the intoxication was of a severity to have had the effect of rendering the appellant incapable of forming the necessary intent,' not just evidence of mere intoxication." *United States v. Peterson*, 47 M.J. 231, 233–34 (C.A.A.F. 1997) (quoting *United States v. Box*, 28 M.J. 584, 585 (A.C.M.R. 1989)).

In our determination of whether this instruction was required, we consider how this matter was litigated at trial. *See United States v. Hibbard*, 58 M.J. 71, 76 (C.A.A.F. 2003). The defense trial theory was that each of the victims was either lying about

whether the charged acts occurred or mischaracterizing consensual conduct as non-consensual conduct. Although there was evidence that the appellant had been drinking at the time of the offenses, the defense did not argue, with respect to any of the victims, that the alleged incident occurred but that the accused's judgment was impaired by alcohol.

We discern no time when the defense introduced evidence of the appellant's intoxication "for the purpose of raising a reasonable doubt as to the existence of . . . specific intent." R.C.M. 916(l)(2). Therefore, we conclude that the appellant has not met his burden to demonstrate plain error and there was no sua sponte duty of the military judge to instruct further on voluntary intoxication. Moreover, even if the military judge had given the instruction from the *Military Judges' Benchbook*, as we conclude that the evidence of intoxication was not of the severity contemplated by *Peterson*, we find beyond a reasonable doubt that any error did not contribute to the appellant's convictions on these offenses. We therefore reject this assignment of error.

*Improper Referral*

The appellant next asserts, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), that the charge of wrongful sexual contact of A1C TY was improperly referred, in that (1) it was re-preferred more than six months after having initially been dismissed, *see* Article 43(g), UCMJ, 10 U.S.C. § 843(g); and (2) it was referred for the improper purpose of enabling the court-martial to consider evidence of an additional sexual assault. Because the appellant failed to object on either ground at trial, he has forfeited these arguments. *See United States v. Sousa*, 72 M.J. 643 (A.F. Ct. Crim. App. 2013); *United States v. Hamilton*, 41 M.J. 32, 36 (C.M.A. 1994). We find no plain error in this matter. The incident with A1C TY occurred on 16 July 2011, and the preferred charges were received by the summary court-martial convening authority on 30 July 2012, well before the statute of limitations expired. The appellant's reliance on Article 43, UCMJ, is misplaced. We further note that even if not charged, the Government could still have sought to admit evidence of the A1C TY incident under Mil. R. Evid. 413. This assignment of error is without merit.

*Consideration of Maximum Sentence for Each Specification*

Finally, the appellant argues that in arriving at a sentence of nine years' confinement, the members sentenced him to three years for each specification. He further argues that because the maximum imposable confinement for a conviction of wrongful sexual contact was 1 year, he was thus "over-sentenced" for the wrongful sexual contact specifications.

As noted above, the maximum sentence to confinement that could be imposed was 32 years. Trial counsel recommended a minimum of ten years' confinement and never

argued that the members should aggregate sentences for individual specifications in arriving at the overall sentence. The military judge instructed the members that they were to return a single sentence for all offenses of which the appellant was convicted. The court members are presumed to have followed that instruction. *See United States v. Thompkins*, 58 M.J. 43, 47 (C.A.A.F. 2003).

There is nothing in the record that supports the appellant's speculation that the members sentenced him to three years for each of the wrongful sexual contact specifications. This is not one of those rare occasions in which we may invade the deliberative process in search of evidence to support the appellant's claims. *See United States v. Dugan*, 58 M.J. 253, 256 (C.A.A.F. 2003); Mil. R. Evid. 509, 606. We, therefore, reject this assignment of error.

## *Conclusion*

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**.

FOR THE COURT

STEVEN LUCAS
Clerk of the Court